# In the United States Court of Federal Claims

No. 24–1363
(Filed: 14 September 2026)

```
************************************
JOHN P. BEAUVAIS. et al.,          *
                                   *
                 Plaintiffs,       *
                                   *
v.                                 *
                                   *
THE UNITED STATES,                 *
                                   *
                 Defendant.        *
                                   *
************************************
```

*Meghan S. Largent*, Lewis Rice LLC, of Washington, DC, for plaintiffs.

*Kyle Lyons-Burke*, Trial Attorney, Natural Resources Section, Environment and Natural Resources Division, Department of Justice, of Washington, DC, for defendant.

## OPINION AND ORDER

**HOLTE, Judge.**

In this Rails-to-Trails case, plaintiffs are a group of thirteen landowners who sued the United States seeking just compensation for the physical taking of their property pursuant to the National Trails System Act. Plaintiffs moved for partial summary judgment on the issue of liability, arguing the conversion of a rail line to a recreational trail exceeds the scope of the express and implied easements the railroad held over plaintiffs' land. The government cross-moved for summary judgment asserting Maryland law treats both railroads and recreational trails as "public highways," so converting from one use to the other is not a taking. After finding no caselaw directly addressing conversion of an easement to a walking trail subject to the deed language at issue here, the Court suggested the parties support certifying the issues to the Supreme Court of Maryland to decide the state law issue. In status reports following oral argument, neither plaintiffs nor the government supported certification. Accordingly, for the reasons below, the Court applies Maryland Supreme Court precedent as best it can and grants plaintiffs' Motion for Partial Summary Judgment, and denies the government's Cross-Motion for Summary Judgment.

The Court notes *Blake v. United States*, No. 24-1372, is also pending before the undersigned and, given the two cases present substantially identical legal issues involving identical deed language, the Court held a joint oral argument with counsel from both cases. The decision in *Blake* is issued contemporaneously with this opinion. For the reasons below,

likewise in the *Blake* case, the Court grants plaintiffs' Motion for Partial Summary Judgment and denies the government's Cross-Motion for Summary Judgment.

## I. Background

### A. Factual Background[1]

Plaintiffs' properties consist of eighteen tax parcels in a 14.73 mile long corridor in Dorchester and Caroline Counties in Maryland. *See* Pls.' Mot. for Partial Summ J. ("Pls.' MPSJ") at 1, ECF No. 18. The original railroad in this corridor was the Baltimore and Eastern Shore Railroad, which acquired easements over the properties in question in the 1890s. *See id.* For all but one parcel, the railroad acquired these easements by deeds containing the same granting language:

> Witnesseth that in consideration of the advantages derived from the construction of the Baltimore and Eastern Shore Railroad and the sum of [varying amounts of monetary compensation] the receipt of which is hereby acknowledged the said [plaintiff(s)] do hereby grant and convey unto the Baltimore and Eastern Shore Railroad company a right of way for its road bed through the lands owned by said [plaintiff(s)].

Pls.' MSPJ, Ex. D *passim*, ECF No. 18-4 (compendium of plaintiffs' written deeds); *see* Pls.' MPSJ at 16.

As for the remaining parcel—the "Brewis property"—there exists no known deed conveying an interest in the Brewis property to the Baltimore and Eastern Shore Railroad. *See* Pls.' MPSJ at 1. It is clear the Baltimore and Eastern Shore Railroad used the Brewis property as part of the Cambridge Secondary Track, *see id.*, and the parties agree the Baltimore and Eastern Shore Railroad's use constituted a prescriptive easement over the Brewis property. *See* 21 Apr. 2026 Oral Argument Transcript ("Tr.") 88:3–90:11.

"On March 1, 2024, the Maryland and Delaware Railroad Company ('MDDE') filed a notice of intent to terminate service under a modified [ ] public convenience and necessity for three segments: (1) 8.23 miles of its rail line extending from milepost 32.47 at Cedar Street in Cambridge, Maryland, to milepost 24.24 at US 50 – Ocean Gateway near Linkwood, Maryland; (2) 6.1 miles of its rail line located in Dorchester and Caroline County, Maryland from milepost 31.2 at Board Street in Hurlock, Maryland, to milepost 25.1 near Railroad Avenue in Preston, Maryland; and (3) 0.4 miles of line located in Dorchester County, Maryland extending from milepost 31.28 in Hurlock, Maryland, to milepost 31.68 at Delaware Avenue in Hurlock, Maryland." Second Am. Compl. ¶ 3, ECF No. 9. On this same day, "Dorchester County, Maryland, petitioned the [Surface Transportation Board ("STB")] for issuance of a Notice of Interim Trail Use or Abandonment in order to convert the otherwise abandoned rail line to a

[1] All facts in this section are undisputed, unless stated otherwise. *See* Rule 56(a) of the Rules of the Court of Federal Claims ("RCFC") (requiring a movant for summary judgment to demonstrate "there is no genuine dispute as to any material fact"). The Court draws all inferences "in the light most favorable to the party opposing summary judgment." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 601 (1986).

public recreational trail." *Id.* ¶ 4. The "owner of the rail line, Maryland Transit Authority ('MTA'), filed a letter confirming its consent to the partial termination of the Modified Certificate and County's request for interim trail use." *Id.* ¶ 5.

"On August 29, 2024, the STB issued a Certificate of Interim Trail Use ('CITU') pursuant to the National Trails System Act, 16 U.S.C. § 1247(d), authorizing the conversion of the otherwise abandoned rail line to a public recreational trail and preserving the rail line for possible future rail use." *Id.* ¶ 6. Plaintiffs John P. Beauvais; Robert L. and Connie F. Frazier Brewis; Delmarva Native Plants, LLC; Margaret E. Hubbard; Amber L. Humphries on behalf of Florence I. Bowdle Estate; Robert F. Karge, Sr. and Gail M. Karge; Marilyn M. Neal; Douglas D. and Patti P. Scott Revocable Trust; Jeffery R. and Sheila M. Smith; Michael H. and Kathryn Swann; William A. and Cathy S. Todd; John C. Vervan; and James and Marilyn F. Harris (collectively, "plaintiffs") argue "[c]reating a public-access recreational trail across [their] property and appropriating a new easement for possible future railroad use has taken from Plaintiffs the value of the land physically appropriated for this trail corridor and greatly diminished the value of the Plaintiffs' property adjoining this trail corridor." *Id.* ¶ 9. Each plaintiff owns property in Maryland that abuts and underlies the former railroad right of way, which is now subject to an easement for an interim public-access trail and possible future railroad reactivation pursuant to the STB's order. *See id.* ¶ 13–38.

### B. Procedural History

On 3 September 2024, plaintiffs filed their Complaint in this court seeking just compensation for the physical taking of their property. *See* Compl. at 7, ECF No. 1. On 4 November 2024, the government filed its Answer to plaintiffs' Complaint. *See* Gov't's Answer, ECF No. 5. Plaintiffs filed their First Amended Complaint on 19 November 2024, removing Kathleen A. and Edward J. Coffman; William Grierson, Jr.; and H and L Land Company, LLC as plaintiffs and adding Delmarva Native Plants, LLC; Amber L. Humphries on behalf of Florence I. Bowdle Estate; Robert F. Karge, Sr. and Gail M. Karge; Marilyn M. Neal; and Douglas D. and Patti P. Scott Revocable Trust as plaintiffs. *See* First Am. Compl., ECF No. 6. The government filed its Answer to plaintiffs' First Amended Complaint on 4 December 2024. *See* Gov't's Answer, ECF No. 8. On 5 December 2024, plaintiffs filed their Second Amended Complaint, adding James and Marilyn F. Harris as plaintiffs. *See* Second Am. Compl., ECF No. 9. On 19 December 2024, the government filed its Answer to plaintiffs' Second Amended Complaint. *See* Gov't's Answer, ECF No. 11.

On 20 August 2025, plaintiffs filed their Motion for Partial Summary Judgment. *See* Pls.' MPSJ. On 17 September 2025, the government filed its Cross Motion for Summary Judgment and Response to plaintiffs' Motion for Partial Summary Judgment. *See* Gov't's Cross Mot. for Summ. J. & Resp. ("Gov't's CMSJ"), ECF No. 19. On 15 October 2025, plaintiffs filed their Reply to the government's Response and their Response to the government's Cross Motion for Summary Judgment. *See* Pls.' Reply & Resp. ("Pls.'s Reply"), ECF No. 20.

On 29 October 2025, the government filed its Reply to the plaintiffs' Response. *See* Gov't's Reply, ECF No. 23. The Court filed an Order on 2 February 2026 setting Oral Argument on plaintiffs' Motion for Partial Summary Judgement on 21 April 2026, in

Washington, DC. *See* 2 Feb. 2026 Order, ECF No. 25. Given the strong similarities between this case and *Blake v. United States*, No. 24-1372, the Court jointly heard oral argument for both cases on 21 April 2026 but did not consolidate the cases. Following oral argument, the Court presented the parties with the opportunity to certify the issues presented in this case to the Supreme Court of Maryland to decide these issues with the finality only the state's highest court could provide. The parties either declined to support or outright opposed certification. *See* Pls.' 22 May 2026 Status Report, ECF No. 29 ("[N]either Plaintiffs in *Beauvais* or *Blake* support certification of either question. Counsel for the government has indicated to Plaintiffs' counsel that the United States does not support certification of the first question; and takes no position on certification on the second question."); Gov't's 1 June 2026 Status Report, ECF No. 30 ("Plaintiffs correctly represented the United States' position on the question of certification . . . .").

## II. Parties' Arguments

Regarding the *express* railroad easements which pertain to all plaintiffs' properties except the Brewis property, plaintiffs argue in their Motion for Partial Summary Judgment "[u]nder Maryland law, the scope of the Railroad's easement does not encompass public recreational trail use." Pls.' MPSJ at 15, ECF No. 18. Plaintiffs recognize the government conceded "the Plaintiffs owned the property on the date [of] the CITU," and "admitted to adjacency of those properties to the Corridor for nine of thirteen Plaintiffs." *Id.* at 15–16. The government admits to possessing "easements as to the relevant portions of the corridor," turning the issue into "whether these easements, executed in the early 1890s, included future use as a public recreational trail . . . ." *Id.* at 16. Further, plaintiffs argue "the consideration for the deed was 'the advantages to be derived from the construction of the Baltimore & Eastern Shore Rail Road,'" thus "[t]he plain language again makes clear that the grantor executed the deed for the purpose of gaining benefits from the construction of a railroad." *Id.* at 25. In response, the government asserts "[t]he railroad's easements over Plaintiffs' properties encompass trail use, just like the easement in *Chevy Chase*." *See* Gov't's CMSJ at 8, ECF No. 19 (citing *Chevy Chase Land Co. v. United States*, 733 A.2d 1055 (Md. 1999)). Considering "the railroad acquired its right of way through nine deeds," the government recognizes the "deeds do not 'suggest any limit on the use of the right-of-way,'" and "a general grant of a right of way to a railroad encompasses use as a public trail." *Id.* at 8–10 (quoting *Chevy Chase*, 733 A.2d at 1073). The government asserts "[t]he deeds at issue in this motion contain no relevant distinctions to the deed at issue in *Chevy Chase*. Therefore, those deeds, like the one in *Chevy Chase*, encompass use as a public trail and no property has been taken from Plaintiffs." *Id.* at 11. The government asserts "the use of the right-of-way as a public trail was legally contemplated by the parties." Gov't's Reply at 4, ECF No. 23 (quoting *Chevy Chase*, 733 A.2d at 1077). The government concludes by stating use of the easement corridor as a recreational trail addresses the public's needs and is "entirely consistent" with use of the easement corridor as a railway. *See id.*

Regarding the *prescriptive* railroad easement which pertains only to the Brewis property, plaintiffs assert "[w]hen an easement is created by prescription, such 'purported implied grants of easements are construed strictly,'" Pls.' MPSJ at 29 (quoting *Lindsay v. Annapolis Roads Prop. Owners Ass'n*, 64 A.3d 916, 930 (Md. App. Ct. 2013), and "when an easement has been acquired by prescription, the character and extent of the use permissible are commensurate with

and determined by the character and extent of the use during the prescriptive period." *Id.* (quoting *Bishields v. Campbell*, 91 A.2d 922, 923 (Md. 1952). Plaintiffs argue "the Baltimore & Eastern Shore Railroad's prescriptive rights gained in the Brewises property were an easement for commensurate with the character and extent of the use over the past century—which is railroad use." *Id.* at 30. Plaintiffs therefore argue "[a] public trail would be wholly inconsistent with [railroad] use," so "[i]t would constitute a new use of the property." *Id.* In response, the government asserts in its Cross Motion for Summary Judgment and Response "[t]he railroad's prescriptive easement encompasses trail use because trail use was reasonably foreseeable and is not unreasonably burdensome." Gov't's CMSJ at 16. Noting "[t]he scope of a prescriptive easement can change over time," the government first states "trail use is arguably not a new use of the easement at all." *Id.* at 16–17. The government further argues even if a recreational trail is a new use, "[i]n any event, use as a recreational trail meets both requirements for falling within the scope of the railroad's prescriptive easement." *Id.* at 17. The government asserts the scope of a prescriptive easement can change where, as here, "the change is (1) 'reasonably foreseeable in light of the[] use during the prescriptive period'; and (2) the altered scope 'would not cause an unreasonable increase in the burden on the easement.'" Gov't's CMSJ at 16 (quoting *Skillman v. Paulen Indus. Ctr., Inc.*, No. 866, 2020 WL 5499055, at *16 (Md. Ct. Spec. App. Sept. 11, 2020). In reply, plaintiffs agree the scope of a prescriptive easement can change if the two conditions the government notes are met, but argues the foreseeability of the change must be "in light of the use during the prescriptive period," which was exclusively railroad use, not trail use. Pls.' Reply at 17.

## III. Legal Standard for Just Compensation Under the Fifth Amendment Takings as Applied to Rails to Trails Cases

The Takings Clause of the Fifth Amendment provides "private property" may not "be taken for public use, without just compensation." U.S. Const. amend. V. This court has jurisdiction over takings claims against the government, including those "that occur pursuant to Section 8(d) of the Trails Act." *Agopion v. United States*, 167 Fed. Cl. 761, 711 (2023); *see Preseault v. I.C.C.*, 494 U.S. 1, 11–17 (1990) ("The Tucker Act provides jurisdiction in the [Court of Federal Claims] for any claim against the Federal Government to recover damages founded on the Constitution, a statute, [or] a regulation . . . . [So, i]f there is a taking, the claim is founded upon the Constitution and within the jurisdiction of the Claims Court" (cleaned up)). In the rails-to-trails context, a Fifth Amendment taking occurs "when government action destroys . . . property rights by converting a railway easement to a recreational trail, if trail use is outside the scope of the original railway easement." *Ladd v. United States*, 630 F.3d 1015, 1019 (Fed. Cir. 2010). "When the government physically acquires property for a public use, the Takings Clause obligates [it] to provide the owner with just compensation." *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 139 (2021) ("The government must pay for what it takes."). *See Almota Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470, 473–74 (1973) ("'[J]ust compensation' means the full monetary equivalent of the property taken. The owner is to be put in the same position monetarily as [they] would have occupied if [the] property had not been taken." (quoting *United States v. Reynolds*, 397 U.S. 14, 16 (1970))).

It is well-settled "just compensation" requires a "determin[ation] . . . [of] monetary equivalence," meaning "the owner is entitled to the fair market value of [the] property at the time

of the taking." *Almota Farmers*, 409 U.S. at 474. This value is generally derived "from 'what a willing buyer would pay in cash to a willing seller'" for the taken property. *Id.* (quoting *Reynolds*, 397 U.S. at 16); *see Miller v. United States*, 223 Ct. Cl. 352, 377 (1980) (noting "the legal definition of fair market value is the price at which property would change hands in a transaction between a willing buyer and a willing seller, neither being under compulsion to buy or sell, and both being reasonably informed as to all relevant facts" (quoting *Jack Daniel Distillery v. United States*, 180 Ct. Cl. 308, 315–16 (1967))). The "sum required to be paid to the owner does not depend upon the uses to which [the landowner] has devoted [to the] land," rather the Court is to consider "the highest and most profitable [(i.e., best)] use for which the property is adaptable." *Olson v. United States*, 292 U.S. 246, 255–56 (1934); *see Otay Mesa Prop., L.P. v. United States*, 779 F.3d 1315, 1320 n.4 (Fed. Cir. 2015) ("In valuing real property, a primary consideration is its 'highest and best use'—i.e., its most profitable use." (quoting *Otay Mesa Prop., L.P. v. United States*, 110 Fed. Cl. 732, 735–36 (2013))). In sum, the "well-established benchmark for just compensation is the 'fair market value' for the 'highest and best use' of the property." *Agapion*, 167 Fed. Cl. at 772 (quoting *Olson*, 292 U.S. at 255). The property owner is to "be made whole but is not entitled to more." *United States v. 564.54 Acres of Land*, 441 U.S. 506, 516 (1979) (quoting *Olson*, 292 U.S. at 255).

## IV. Interpretation of the Written Deeds' Terms in Light of the Plain Language of the Deeds, Maryland Caselaw, Corpus Linguistics, and the Deeds' Consideration Clauses

The Court first examines the written deeds to determine whether use as a walking trail is permitted within the scope of the easements. "The acquisition of property rights is governed by the law of the state in which the property sits." *Pressley v. United States*, 174 F.4th 1368, 1374 (Fed. Cir. 2026) (citation omitted). To evaluate the scope of the deeds, the Court therefore interprets the deeds according to Maryland law. First, the Court interprets the phrase "for its road bed" as used in the deeds under plain language. Second, the Court looks to applicable Maryland caselaw to guide the Court's interpretation of the deeds. Third, the Court interprets "for its road bed" through a corpus linguistics analysis to discern the likely meaning of the term at the time the deeds were executed. Fourth, the Court analyzes the consideration clauses of the deeds to determine whether the stated consideration sheds light on the scope of the deeds at issue.

### A. Plain Language Analysis of the Granting Clause in the Express Easements

The Court first looks to the plain language of the granting clause to discern the scope of the easement granted therein. Maryland courts "interpret an easement created by deed, an express grant, through a proper construction of the conveyance by which the easement was created." *Long Green Valley Ass'n v. Bellevale Farms, Inc.*, 68 A.3d 843, 855 (Md. 2013) (quotation omitted). "The intention of the parties at the time the easement was granted is the North Star guiding [the] interpretation of it." *Id.* at 856 (citation omitted). "Therefore, [the Court's] focal point is the language of the agreement itself[,] seeking to discern what a reasonable person in the position of the parties would have meant at the time it was effectuated." *Id.* (quotations omitted).

All nine deeds at issue here contain the following language in the granting clause:

> that in consideration of the advantages to be derived from the construction of the Baltimore and Eastern Shore Rail Road . . . [grantors] do hereby grant and convey unto the said Baltimore and Eastern Shore Railroad Company *a right of way for its road bed* through the lands [of the grantor].

Pls.' MPSJ, Ex. D, ECF No. 18-4 (compendium of plaintiffs' written deeds); *see* 21 Apr. 2026 Oral Argument Transcript ("Tr.") at 9:16–11:20 (all parties' agreeing all of plaintiffs' written deeds contain the same critical granting language as above). The phrase "right of way *for its road bed*" dictates the easement is granted "for" a particular purpose, in this instance, for *its* road bed. The parties agree the "its" in the clause refers to the Baltimore and Eastern Shore Railroad. Tr. at 16:24–17:3, 17:20–22. The deed can therefore be read to say the right of way is granted "for the railroad's road bed." Tr. at 16:24–17:3; 18:12–15 (parties' agreement the phrase can fairly be read as "for the railroad's road bed"). Road bed, according to modern Merriam Webster refers to (1) "the bed on which the ties, rails, and ballast of a railroad rest and (2) "the earth foundation of a road prepared for surfacing." *Road bed*, Merriam-Webster, https://www.merriam-webster.com/dictionary/roadbed (last updated Mar. 27, 2026); *Credible Behav. Health, Inc. v. Johnson*, 220 A.3d 303, 311 (Md. 2019) (explaining Maryland courts often "consult[] the dictionary definition of such terms" to supply language with its "ordinary and accepted meanings"); *Pac. Indem. Co. v. Interstate Fire & Cas. Co.*, 488 A.2d 486, 488 (Md. 1985) (commenting Maryland courts "ha[ve] consulted Webster's Dictionary, Random House Dictionary, or, less often, Black's Law Dictionary" (citations omitted)). The American Heritage College Dictionary similarly defines "road bed" as "1.a. The foundation upon which ties, rails, and ballast of a railroad are laid. b. A layer of ballast directly under the ties. 2. The foundation and surface of a road." *Road bed*, American Heritage College Dictionary (5th ed. 2022), https://www.ahdictionary.com/word/search.html?q=road+bed. As the first definitions in recent dictionaries both explicitly tie "road bed" to use related to a railroad and, considering the deeds state the easement is for the Baltimore and Eastern Shore Railroad's road bed, the most natural definition to apply is the one specifically relating to railroads. Looking to dictionaries concurrent with the grant, "A Dictionary of Law" by William Anderson, published in 1893, includes an entry for "road-bed" which simply states "See Railroad." *Road-bed*, William Anderson, A Dictionary of Law (1893). Plaintiffs further supplied at oral argument two Websters dictionaries from 1894 and 1895. The 1894 dictionary defines "roadbed" as "[i]n railroads, the bed or foundation on which the superstructure (ties, rails, etc.) rests; in common roads, the whole material laid in place and ready for travel." *Roadbed*, Webster's International Dictionary of the English Language (1894). The 1895 dictionary similarly defines the term as "[f]oundation (ties, rails, etc.) of a railroad; material in place for travel on a common road." *Roadbed*, Webster's Academic Dictionary (1895). A common theme emerges throughout the contemporary and historical dictionaries. While "roadbed" can be used to refer to both common roads and railroads, when used in the context of a railroad it specifically refers to the railroad's track line, not to a general right of way. Here, the deeds unquestionably refer to "roadbed" as it relates to the Baltimore and Eastern Shore Railroad. *See* Pls.' MPSJ, Ex. D ("[T]o the Baltimore and Eastern Shore Railroad a right-of-way for its road bed."). Accordingly, looking to the plain language of the deed with the aid of contemporary and historical dictionaries, the language of the deed supports a limited easement for railroad purposes only, and not a general right of way. *See*

*Long Green Valley Ass'n*, 68 A.3d at 855 ("our focal point is the language of the agreement itself, seeking to discern what a reasonable person in the position of the parties would have meant at the time it was effectuated" (cleaned up)).

### B. Analysis of the Granting Clause in the Express Easements under Maryland Caselaw

The Court next evaluates the terms of the written deeds against relevant Maryland caselaw. In *Chevy Chase Land Co. v. United States*, 733 A.2d 1055, 1058–59 (Md. 1999), the Federal Circuit certified three questions to the Supreme Court of Maryland related to the interpretation of a 1911 deed of an interest in land to a railroad company. The Supreme Court of Maryland addressed: (1) "Under Maryland law, did the 1911 deed convey an interest in fee simple absolute or an easement"; (2) "If the deed conveyed an easement, is the easement subject to any limitations as a matter of law"; and (3) "If the deed conveyed an easement, has the easement been abandoned as a matter of law since its conveyance and, if so, when?" *Id.* at 1059. After holding the 1911 deed conveyed an easement over the property, *id.* at 1068, the court examined the terms of the 1911 deed to determine whether the easement was limited to use for railroad purposes. *Id.* at 1072–80. The court focused on the specific language that granted the railroad "a free and perpetual right of way," and interpreted the words "free" and "perpetual" to confirm the easement conveyed a general right of way rather than one strictly for railroad use. *Id.* The court also noted the deed "d[id] not suggest any limit on the use of the right-of-way," and contrasted the deed against past cases where the deed language specified the easement was "for railroad purposes." *Id.* at 1073. From these determinations, the court held the 1911 deed did not limit the scope of the easement to railroad purposes, and thus the transition of the easement from a railroad to a walking trail was not a taking because it was consistent with the use of the easement as a general right of way. *See Chevy Chase*, 733 A.2d at 1080.

Here, plaintiffs' written deeds—which grant the railroad a "right of way for its road bed"—materially differ from the 1911 deed in *Chevy Chase* which granted the railroad "a free and perpetual right of way." *Id.* at 1073. First, there are no terms in the deeds here like "free" and "perpetual," which were critical to the *Chevy Chase* court's decision the 1911 deed conveyed a general right of way. *See id.*; *Macy Elevator, Inc. v. United* States, 97 Fed. Cl. 708, 727 (2011) (distinguishing an Indiana easement deed from *Chevy Chase* because "[t]he deeds in *Chevy Chase* included the words 'free' and 'perpetual'" (citation omitted)); *Jenkins v. United States*, 102 Fed. Cl. 598, 612 (2011) (distinguishing an Iowa easement deed from *Chevy Chase* because the deed included "for said railroad and for any other Rail Road purposes" and did not include "free and perpetual"). The deeds here convey only a "right of way." *See* Pls.' MPSJ, Ex. D. Second, the deeds in this case explicitly include purpose language stating the right of way is "for its road bed," while the 1911 deed in *Chevy Chase* contains no terms specifying the right of way is "for" anything at all. *Compare id., with Chevy Chase*, 733 A.2d at 1065. The parties agreed at oral argument this same language could be read to say the right of way is "for the railroad's road bed," *see* Tr. at 16:24–17:1; 18:12–15—a phrase which tracks far closer to the cases *Chevy Chase* distinguishes which state the easement is "for railroad purposes." *See* 733 A.2d at 1073; *E. Washington Ry. Co. v. Brooke*, 223 A.2d 599, 603 (Md. 1966) (concluding that deed language "for railroad purposes" limits the scope of the right of way granted by the easement to "railway purposes and use only" (citation omitted)). The parties' agreement the

phrase "for its road bed" can fairly be read as "for the railroad's road bed," and the similarity between "for railroad purposes" and "for the railroad's road bed" is substantive, and strongly suggests the easement is one narrowed to railroad purposes only. *See Chevy Chase*, 733 A.2d at 1073 (confirming past Maryland cases hold a right-of way "for railroad purposes" establishes a limited easement). At oral argument, the government further provided other examples of language it would consider sufficient to establish an easement limited to railroad use including "limited to railroad use," "for railroad use," "nothing except railroad use," and "solely for use as a railroad." Tr. at 12:19–25. The government did not expand on what material difference there is between "for railroad use" and "for the railroad's road bed." *Id.* Accordingly, drawing on the analysis of the Supreme Court of Maryland in *Chevy Chase*, the absence of broadening language such as "free and perpetual" and the presence of the purpose language "for its road bed" supports a limited construction of the written deeds in this case as being limited to railroad use. *See Chevy Chase*, 733 A.2d at 1073; *Brooke*, 223 A.2d at 603.

### C. Corpus Linguistics Analysis of the Historical Meaning of the Term "Road bed"

The Court next looks for the historical meaning of the term "road bed" using a Corpus Linguistics Analysis. Other courts have used corpus linguistics to interpret the original meaning of historical terms. "Corpus linguistics describes language empirically with reference to books, scripts, magazines, newspapers, and more." *Caesars Ent. Corp. v. Int'l Union of Operating Eng'rs Local 68 Pension Fund*, 932 F.3d 91, 95 n.1 (3d Cir. 2019) (using corpus linguistics to interpret "previously"); *see also Richards v. Cox*, 450 P.3d 1074, 1085–86 (Utah 2019) (Lee, J., concurring) (concurring with the majority opinion "to the extent it relies on corpus linguistic analysis" to support constitutional and statutory interpretation); *State v. Rasabout*, 356 P.3d 1258, 1275–82 (Utah 2015) (Lee, J., concurring) (explaining corpus linguistics and applying it to confirm the majority's interpretation of statutory term). "[I]n contrast to dictionaries, corpus linguistics is a method for studying language in use and can thus account for some aspects of context. Unlike dictionaries, corpus linguistics allows for the meaning of words to be investigated in light of other words in which they co-occur." Stefan Th. Gries & Brian G. Slocum, *Ordinary Meaning and Corpus Linguistics*, 2017 B.Y.U. L. Rev. 1417, 1441 (footnote omitted). "Corpus linguists teach that 'the best way to find out about how language works is by analyzing real examples of language as it is actually used.'" Thomas R. Lee & James C. Phillips, *Data-Driven Originalism*, 167 U. Pa. L. Rev. 261, 289 (2019) (quoting Paul Baker, *Glossary of Corpus Linguistics* 65 (2006)). "The concept underlying corpus linguistics is also consistent with the idea that an ordinary meaning is one that, in some sense, is general and cuts across contexts." Gries & Slocum, *supra*, at 1441.[2]

---

[2] Just as other courts have used corpus linguistics to interpret the original meaning of historical terms, so has the Court of Federal Claims. 28 U.S.C. § 1500—a statute limiting duplicitous lawsuits against the United States—reads "The United States Court of Federal Claims shall not have jurisdiction of any claim for or in respect to which the plaintiff . . . has pending in any other court any suit or *process* against the United States . . . ." 28 U.S.C. § 1500 (emphasis added). In *Nycal Offshore Development Corp. v. United States*, this court used corpus linguistics to help determine the ordinary meaning of "process" as understood in 1868 when Congress passed § 1500. *See* 148 Fed. Cl. 1, 13 n.6 (2020); *see also Leebcor Servs., LLC v. United States*, 171 Fed. Cl. 14, 18–20 & nn.2–3 (2024) (analyzing the same). Through the corpus linguistic analysis, this court found various historical uses of the word "process" supported the interpretation of "process" in § 1500 as meaning "*direct engagement* of a lawsuit between the parties," which did not encompass plaintiff's pending appeal. 148 Fed. Cl. 13 n.6.

"A database of . . . naturally occurring language is called a corpus." *Caesars Ent. Corp.*, 932 F.3d at 95 n.1. Courts "can use corpora to perform analyses unavailable in standard sources like dictionaries. These analyses include measuring . . . the statistical frequency of a word and the linguistic contexts in which it appears." *Id.* (citing Thomas R. Lee & Stephen C. Mouritsen, *Judging Ordinary Meaning*, 127 Yale L.J. 788, 806–13, 828–32 (2018)). One widely used corpus is the Corpus of Historical American English ("COHA")—i.e., "the largest structured corpus of historical English." *Lee & Mouritsen*, *supra*, 127 Yale L.J. at 835 (quoting Corpus of Historical American English, BYU, https://www.english-corpora.org/coha/). The COHA "contains 'more than 400 million words of text from the 1810s–2000s . . . and the corpus is balanced by genre decade by decade.'" *Id.* (quoting Corpus of Historical American English, BYU, https://www.english-corpora.org/coha/). By "[u]sing data from the COHA, [a user] can gather linguistic information from the decade that a statute was enacted, going back approximately 200 years." *Id.* "[T]he 400 million words of the COHA are spread out over 200 years . . . [and] the COHA remains the largest corpus of historical American English." *Id.* at 835–36. Another useful corpus is the Corpus of Reconstruction Era American English ("COREA") maintained by Brigham Young University. *See Corpus of Reconstruction Era American English*, Brigham Young University, https://lawcorpus.byu.edu/corea/sub/main/concordances. This corpus contains over 121,000 texts published in the United States between 1863 and 1899, *see id.* (click "Corpus Filters" on left sidebar; then click "+ Add filter type"; then choose "Year"; then scroll through available publication years), which is relevant for this case because the deeds in question were executed between 1891 and 1894, *see* Pls.' MPSJ, Ex. D.

Applying corpus linguistics analysis to this case, the Court first searched the COHA for historical usage of "road bed" as two separate words. The search identified 14 results spanning from 1820–2010. The closest results to the time of the deeds' execution (1891–1894) were two novels written in 1907 and 1908, which each used the term "road bed" in reference to railroads. The Court next searched the COHA for "roadbed" as one word. This search yielded 204 results from 1820–2010, of which there were 14 results from 1888–1899. The majority of the results again use "roadbed" in specific reference to a railroad. For example, an 1892 feature in the New York Times stated "[w]e have secured the right of way for twenty-nine miles out of Chicago, and we are all right at the St. Louis end. The roadbed will be sloping with a permits bottom, and there will be a ditch between the two sets of tracks and a ditch outside of each set." *A Hundred Miles an Hour: Promised Rate of Travel from St. Louis to Chicago*, N.Y. Times, June 3, 1892, at 1. The sole exception was a fictional romance novel published in 1893, which used "roadbed" in a prolonged description of a patch of submerged land. Mary Hartwell Catherwood, *Old Kaskaskia* 148 (1893). None of the uses in the COHA database, however, referenced a walking trail or pathway.

The Court next ran the same two searches on the COREA database. The split term "road bed" yielded 796 occurrences across 94 sources, but none were within the 1888–1899 date range. The results of the COREA database were less clear; while the majority of uses of "road bed" referred specifically to railroads, an 1879 congressional record used the term in reference to a canal excavation, *see* 8 Cong. Rec. 1366 (1879), an 1874 New Jersey case used the term for city street being re-paved, *see Agens v. City of Newark*, 37 N.J.L. 415, 420 (1874), and an 1872 New

York case used it to refer to a turnpike road, *see New York v. Williamsburg Turnpike & Bridge Co.*, 47 N.Y. 586, 594 (1872). Searching for "roadbed" as one word yielded 89 results which largely mirrored the results from the two-word inquiry and still produced no matches within the 1888–1899 date range.

Finally, the Court searched the COHA database for pre-1800 uses of the terms "road bed" and "roadbed" to ensure it was not used to previously refer to a walking trail prior to the invention of the railroad in 1804. The search did not provide any results prior to 1800.

In sum, a corpus linguistic analysis of the terms "road bed" and "roadbed" leads the Court to the same result as the contemporary and dictionaries examined in Section IV.A, *supra*: the use of the term "road bed" and "roadbed" overwhelmingly reference use by a railroad for its railroad track, and thus supports an easement limited to use for railroad purposes. Even accounting for the limited exceptions where "road bed" or "roadbed" were used to describe a general road of some fashion, there is no instance in the corpus of "road bed" or "roadbed" being used to describe a walking trail or other such pathway.

**D. Consideration Paid in the Deeds to the Grantor by the Railroad**

The Court next examines the consideration clauses of the written deeds to discern the scope of the easements granted. Each of the deeds in this case state the right of way is granted "in consideration of the advantages derived from the construction of the Baltimore and Eastern Shore Railroad, and the sum of [varying amounts] dollars in hand." Pls.' MPSJ, Ex. D; Tr. at 65:21–66:12 (all parties confirming the consideration clauses in each deed are identical except for amount of monetary consideration). Plaintiffs argue this language "makes clear that the grantor executed the deed for the purpose of gaining benefits from the construction of a railroad," which supports interpreting the deed to include railroad purposes only. Pls.' MPSJ at 25. The government asserts the consideration language simply indicates "the grantor kn[e]w the land would be used for a railroad," which cannot itself limit the scope of an easement. Gov't's CMSJ at 14.

When construing whether a deed conveyed a fee or easement interest and the scope of any easement interest, the Supreme Court of Maryland has looked to the consideration clause of the deed to discern the intent of the grantor. *See Hodges v. Owings*, 13 A.2d 338, 340 (Md. 1940). In *Hodges*, the court held a deed conveyed an easement limited to railroad uses because the deed was conveyed, "in consideration that the Chesapeake Beach Railway Company do locate its Railroad through, in and upon lands owned" by the grantor. *Id.* The Court held this language demonstrated "the purpose of the grantee was the building of a railroad, in which the grantor was willing to cooperate." *Id.* The consideration thus made it "plain that the conveyance was of an easement for railway purposes and use only." *Id.*

Here, the "consideration" for granting the easement, in addition to typical monetary consideration, is specifically the "advantages to be derived from construction of the Baltimore and Eastern Shore Rail Road." Pls.' MPSJ at 23–24; *see also* Pls.' MPSJ, Ex. D *passim*. Put another way, the clauses plainly state the right of way is granted in return for both the advantages that are presumed to come with construction of a railroad *and* a sum of money. This form of

consideration is best explained if the easement being granted is restricted to use only for railroad purposes which would then create the expected railroad-related advantages. If the easement were not so restricted, and the railroad was free to use the easement as any general right of way, the express consideration of advantages related to a railroad would be entirely illusory; if the railroad is not required to use the easement only as a railroad, it would be absurd for the advantages of that railroad to be part of the consideration.

The government invokes *Chevy Chase* to argue the consideration clauses only show the grantors *expected* a railroad to be built on the easement, which cannot itself create an express limitation on the scope of the easement. *See* Gov't's CMSJ at 13–14. In *Chevy Chase*, the court acknowledged "the circumstances clearly indicate that the original instrumentality was a railroad," in part because an agreement predating the deed stated the easement would be granted "in contemplat[ion of] the construction of a line of road . . . to traverse the property." 733 A.2d 1055, 1073 (Md. 1999) (alteration in original). The court held this clear contemplation of a railroad nevertheless did not limit the scope of the easement because "nowhere in the granting clause or elsewhere *in the deed* does the language suggest that a railroad was the only instrumentality for use of the perpetual right-of-way." *Id.* (emphasis added). Here, however, the deed does not simply state the easement is "in contemplation" of a "line of road"; rather, the consideration clauses expressly make the "advantages to be derived" specifically from a railroad a part of the consideration granted in return for the easement. This consideration, moreover, is a part of the deed which grants the easement itself, not a separate, earlier agreement as was the case in *Chevy Chase*. *Id.* at 1073; Pls.' MPSJ, Ex. D. The deeds' express inclusion of the railroad's construction in the consideration paid to the grantor for the easement inclines toward supporting an interpretation of the easement restricted specifically to railroad uses, and *Chevy Chase* says nothing to the contrary. The deeds here are therefore more like the deed in *Hodges* where the Court of Appeals of Maryland held the consideration clause made it "plain that the conveyance was of an easement for railway purposes and use only." *Hodges*, 13 A.2d at 340.

## V. Whether the Written Deeds Convey a General Right of Way or One Limited to Use for Railroad Purposes

As discussed in detail *supra*, the written deeds each contain the same language specifying the right of way being conveyed is for the railroad's "road bed." Contemporary and historical dictionaries confirm the most natural reading of this phrase refers to use of the right of way as track line for the railroad and not use as a general right of way. *See supra* Section IV.A. This language also differs from Maryland caselaw where a "free and perpetual" right of way may grant an easement not limited to railroad purposes, but is analogous to Maryland cases where the phrase "for railroad purposes" expressed an easement limited to those purposes. *See supra* Section IV. B. A Corpus Linguistics analysis of "road bed" provides further support the phrase, at the time of the deeds' executions, would have been understood to refer to a railroad, rather than any public highway or thoroughfare. *See supra* Section IV.C. Finally, the express inclusion in the consideration clause of the deeds that the easement was granting "in consideration of the advantages to be derived" from a railroad further supports the notion the deeds granted only an easement for railroad purposes. *See supra* Section IV.D. In conclusion, the Court finds the language in the written deeds demonstrates the transfer of an easement limited to railroad

purposes, and therefore transformation of the easement from a railroad to a walking trail exceeds the scope of these easements.

## VI. Whether the Railroad's Prescriptive Easement on the Brewis Property Encompasses Use as a Walking Trail

The Court next determines whether the prescriptive easement encumbering the property of the Brewis plaintiffs encompasses the government's use of the property as a walking trail instead of a railroad. The parties agree there is no known source of title for the railroad track across the Brewis property. *See* Tr. at 88:24–89:14, 90:5–14. In such instances, Maryland law presumes the railroad to have a prescriptive easement over the property. *Maryland & P.R. Co. v. MercantileSafe Deposit & Tr. Co*., 166 A.2d 247, 248–49 (Md. 1960) ("The general rule is that a railroad company acquires only an easement in a right of way by prescription."); *cf. Pressly v. United States*, 174 F.4th 1368, 1378 (Fed. Cir. 2026) (applying state law to determine the effect of a lost or missing deed). The only issue before the Court is thus whether the prescriptive easement over the property is limited to railroad uses only, or if the right of way encompasses use as a walking trail.

Under Maryland law, "purported implied grants of easements are construed strictly." *Lindsay v. Annapolis Roads Prop. Owners Ass'n*, 64 A.3d 916, 930 (Md. 2013) (citing *Buckler v. Davis Sand & Gravel Corp.*, 158 A.2d 319, 323 (Md. 1960)); *see also Condry v. Lauris*, 41 A.2d 66, 68 (Md. 1945) ("[G]rants of easements by implication are looked upon with jealousy and are construed with strictness by the courts."). "One form of implied easement is an easement by prescription." *Kirby v. Hook*, 701 A.2d 397, 402 (Md. 1997) (citation omitted); Tr. at 99:6–9 (THE COURT: Does the government agree then that a prescriptive easement is an implied easement and should be construed strictly? [GOVERNMENT]: Yes.") (cleaned up). "[W]hen an easement has been acquired by prescription, the character and extent of the use permissible are commensurate with and determined by the character and extent of the use during the prescriptive period." *Bishields v. Campbell*, 91 A.2d 922, 923 (Md. 1952) (citation omitted); *Maryland & P.R. Co.*, 166 A.2d at 249 (holding scope of a prescriptive easement to a railroad is governed by same principles as for individuals). The scope of a prescriptive easement may change over time, but only where the change is (1) reasonably foreseeable in light of the use during the prescriptive period; and (2) the altered scope would not cause an unreasonable increase in the burden on the easement. *See Mahoney v. Devonshire, Inc.*, 587 A.2d 1146, 1152–53 (Md. Ct. App. 1991) (holding increased traffic on prescriptive roadway easement a permissible expansion because the use was foreseeable and reasonable given its prior use); Tr. at 94:7–13, 95:1–4 (parties' agreement the two-part standard for altering the scope of a prescriptive easement applies).

Here, the government concedes there is no evidence the easement over the Brewis property "was ever used for anything other than a railroad." Tr. at 101:7–11. When asked at oral argument what prior use of the easement establishes the easement's scope includes use as a walking trail, the government did not suggest the easement was used in any other manner. Tr. at 101:12–16. Instead, the government argues *Chevy Chase* establishes use of the easement as a walking trail "is compatible and consistent with [] prior use as a rail line," and therefore use of the easement as a walking trail "is arguably not a new use of the easement at all." *See* Gov't's

CMSJ at 17 (quoting *Chevy Chase*, 733 A.2d at 1078). *Chevy Chase*, however, did not deal with the scope of a prescriptive easement, but an express easement. *See* 733 A.2d at 1072 (interpreting the written 1911 deed). The express easement, moreover, specifically provided the easement was a "free and perpetual right-of-way," which the Supreme Court of Maryland determined granted a general right of way without restriction to railroad purposes. *Id.* at 1072–74. The easement over the Brewis property is a prescriptive easement which under Maryland law must be "construed strictly," *Lindsay*, 64 A.3d at 930. Additionally, the "character and extent of the use during the prescriptive period" is what governs the scope of the easement, not the language of a nonexistent grant, *Bishields*, 91 A.2d at 923. Accordingly, given the use of the easement was exclusively for railroad purposes, the Court strictly construes the prescriptive easement to be limited to use for railroad purposes, and not as a walking trail. *See Bishields*, 91 A.2d at 923; *Lindsay*, 64 A.3d at 930.

The government next argues even if use as a walking trail is a new use of the prescriptive easement, the scope of the prescriptive easement encompasses trail use under the two-part test in *Mahoney*. Gov't's CMSJ at 17. The government asserts the *Chevy Chase* case establishes trail use is "foreseeable" because use as a railroad or a walking trail can both be understood as a "public highway," and conversion to a walking trail "imposes no new burdens" on the property. *Id.* at 17–18. The government, however, again stretches *Chevy Chase* beyond its facts. *Chevy Chase* held an *express* easement which granted a "free and perpetual right-of-way" could foreseeably be converted to a walking trail because a walking trail is one of various forms of a "public highway," so changing the easement from one highway to another "constitute[d] a change in instrumentality consistent with the essential purpose anticipated at the time of the original grant." 733 A.2d at 1073, 1077. The court in *Chevy Chase* explained "the starting point for determining whether the current use [of the express easement] as a hiker/biker trail is compatible with its prior use is *the deed itself*." *Id.* at 1076 (emphasis added). The prescriptive easement here lacks any deed to interpret, and the Court's inquiry is instead whether the conversion of the easement from a railroad to a walking trail is reasonably foreseeable in light of the *use during the prescriptive period* and whether the new use unreasonably increases the burden on the easement. *See Mahoney*, 587 A.2d at 1152–53. In *Mahoney*, the Maryland Court of Appeals held an increase in vehicular traffic on a road subject to a prescriptive easement was a permissible expansion of the easement's scope because it was "foreseeable that the property of appellees would be subdivided and the right-of-way required to bear an increased burden of use." *Id.* at 1153. Here, however, the alteration in scope is not merely a question of an increase in the degree of use, but a shift in the instrumentality of use altogether. Rather than more trains crossing over the Brewis property, as would be analogous to the increase in vehicular traffic in *Mahoney*, the railroad here was torn out and replaced entirely with a walking trail. *See Bishields*, 91 A.2d at 923 (Md. 1952) ("[W]hen an easement has been acquired by prescription, the character and extent of the use permissible are commensurate with and determined by the character and extent of the use during the prescriptive period." (citation omitted)); *see also* 86 Causes of Action 2d 533 § 21 (2019) ("[A] change from a railroad to a recreational trail is generally found to be of a different nature of use and [it is generally found] that hiking, biking, and sightseeing over a trail . . . are uses outside the scope of a limited railroad-purpose easement . . . ."); *cf. Preseault v. United States*, 100 F.3d 1525, 1543 (Fed. Cir. 1996) ("It is one thing to have occasional railroad trains crossing one's land. Noisy though they may be, they are limited in location, in number, and in frequency of occurrence. . . . When used for public

recreational purposes, however, . . . the burden imposed by the use of the easement is at the whim of many individuals, and . . . has been impossible to contain in numbers or to keep strictly within the parameters of the easement." (interpreting Vermont law)).

The government has pointed to no evidence in the record to establish this transformation was "foreseeable" in light of the easement's past use exclusively for railroad purposes. Given the altered scope of the easement was not foreseeable, the Court need not determine the reasonableness of the new burden on the easement. *See Mahoney*, 587 A.2d at 1152–53 (use must be both "foreseeable" and new burdens "reasonable"). Accordingly, the prescriptive easement over the Brewis property does not encompass use as a walking trail, and such use was not sufficiently foreseeable to constitute a permissible alteration in the easement's scope. *See id.*

## VII. Conclusion

For the foregoing reasons, the Court **GRANTS** plaintiffs' Motion for Partial Summary Judgment, ECF No. 18, and **DENIES** the government's Cross-Motion for Summary Judgment, ECF No. 19. The parties **SHALL FILE** a joint status report proposing a timeline for further proceedings consistent with this opinion on or before **14 October 2026**.

**IT IS SO ORDERED.**

s/ Ryan T. Holte
RYAN T. HOLTE
Judge